IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA

| | | |
|---|---|---|
| Maurice Wyman Scott, | ) | C/A No.: 3:15-2692-CMC-SVH |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | REPORT AND RECOMMENDATION |
| | ) | |
| Chrome Capital, LLC, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

Maurice Wyman Scott ("Plaintiff"), proceeding pro se and in forma pauperis, brought this action against Chrome Capital, LLC ("Defendant"). This matter comes before the court on Defendant's motion to dismiss filed on September 2, 2015, pursuant to Fed. R. Civ. P. 12(b)(2), (4), (5), and (6).  [ECF No. 21]. On September 2, 2015, the court issued an order pursuant to *Roseboro v. Garrison*, 528 F.2d 309 (4th Cir. 1975), notifying Plaintiff of the dismissal procedures and possible consequences if he failed to adequately respond to Defendant's motion. [ECF No. 24]. Defendant accepted service of process on May 24, 2016, which rendered its arguments under Fed. R. Civ. P. 12(b)(2), (4), and (5) moot. [ECF No. 31]. Because the parties presented evidence outside of the pleadings, the undersigned informed them that Defendant's motion would be construed as a motion for summary judgment and permitted them to submit additional evidence, if any, for the court's consideration. [ECF Nos. 29, 33]. The motion having been fully briefed [ECF Nos. 21, 25, 26, 28, 35, 37], it is ripe for disposition.

All pretrial proceedings in this case were referred to the undersigned pursuant to the provisions of 28 U.S.C. § 636(b)(1)(B) and Local Civ. Rule 73.02(B)(2)(e) (D.S.C.).

Because Defendant's motion is dispositive, this report and recommendation is entered for the district judge's consideration. For the reasons that follow, the undersigned recommends the district judge grant the motion.

I.      Factual and Procedural Background

        A.      Complaint

Plaintiff alleges the court has jurisdiction under the Fair Debt Collection Practices Act ("the FDCPA"); 41 U.S.C. § 6503; and 28 U.S.C. § 1332, the diversity statute. [ECF Nos. 10 at 1 and 12]. He maintains Defendant conspired with Capital City Cycles ("CCC") to illegally repossess his motorcycle. [ECF No. 12 at 3]. He contends individuals affiliated with CCC invaded his privacy by visiting his home repeatedly and without invitation or authorization. *Id.* at 4. He maintains Defendant wrongly asserted its contract with him was incomplete as a result of a failed payment to CCC[1] that was not covered under the terms of the contract. *Id.* at 3. He alleges Defendant violated his privacy rights[2] under the contract by communicating with CCC regarding the debt. *Id.* He

_____

[1] In his Response in Opposition to Defendant's Motion, Plaintiff alleges that Defendant violated the Truth in Lending Act ("TILA") if it accepted the assignment of the contract from CCC with knowledge that he had not paid the amount due at lease signing. [ECF No. 25 at 4–5]. Because Plaintiff fails to allege a violation of the TILA in the complaint and only speculates as to Defendant's awareness of his payment of the amount due at lease signing, the undersigned declines to address whether the TILA is applicable to the contract between the parties or whether Defendant complied with the requirements of the TILA.

[2] Plaintiff indicates in his response that Defendant violated the Privacy Act of 1974 by disclosing information regarding the contract and payments to CCC. [ECF No. 25 at 1–2]. The undersigned notes that the Privacy Act of 1974 pertains exclusively to federal agencies. *See* 5 U.S.C. § 551, 552; *see also Thompson v. Vista View, LLC*, 2009 WL 2705857, at *7 (S.D.W.Va. Aug. 24, 2009) ("While the Privacy Act creates a private right of action for a violation of the Act, such an action 'is specifically limited to actions

contends Defendant did not give him an effective right to cure the default because it notified him of its intention to sell the motorcycle before the expiration of the period it had previously given him to acquire insurance. *Id.* at 3, 4. He alleges Defendant failed to notify him of the time, date, and outcome of the motorcycle's sale and did not provide him with a reconciliation of the debt after the sale. *Id.* at 4. He maintains Defendant fraudulently misrepresented the amount due under the contract. *Id.* at 5. He contends Defendant conspired with CCC to obtain funds in addition to those specified under the terms of the contract. *Id.* at 4.

Plaintiff seeks the following relief: (1) return of all listed down payments, fees, and payments made to Defendant; (2) statutory damages for violations of the FDCPA; and (3) punitive damages in the amount of $100,000. [ECF No. 12 at 5].

B.    Factual Background

On August 27, 2014, Plaintiff entered into an agreement ("Lease Agreement") with CCC for the lease of a used 2011 Harley Davidson FXDB motorcycle with Vehicle Identification Number 1HD1GX413BC303642 ("the Motorcycle").[3] [ECF No. 21-2 at 1–

---

against agencies of the United States Government.'" *Unt v. Aerospace Corp.*, 765 F.2d 1440, 1447 (9th Cir. 1985).). Because Defendant is not a federal agency, Plaintiff cannot bring a cause of action under the Privacy Act of 1974.

[3] Although Plaintiff identified the agreement in his amended complaints as one for the sale of the Motorcycle [ECF No. 12 at 3], the agreement was labeled as "Motor Vehicle Lease Agreement—Closed End" and "Monthly Payment Lease" was checked on the first page of the document. [ECF No. 21-2 at 1]. The Lease Agreement further provided that it was "a lease only" and that Plaintiff had "no ownership interest in the Vehicle except for any future options to purchase provided in this Lease." *Id.* at 5. The last page of the Lease Agreement contained the following text "Notice. You have no ownership rights in the vehicle unless and until you exercise your option to purchase the Vehicle." [ECF No. 21-2 at 7]. Furthermore, a Certificate of Title was issued to Defendant, as owner of the

3

7]. The Lease Agreement provided that $3,309.26, which included a capitalized cost reduction ("down payment")[4] of $2,515.00, a first monthly payment of $394.26, and a refundable security deposit of $400.00, was the "[a]mount to be paid in cash" to CCC at lease signing. [ECF No. 21-2 at 2]. It reflected a total gross capitalized cost of $14,120.00. *Id.* However, that amount was reduced to an adjusted capitalized cost of $11,600.00 after the down payment of $2,515.00. *Id.* The adjusted capitalized cost was further reduced by subtraction of the residual value of the Motorcycle after the lease term. *Id.* Thus, the payment breakdown reflected a charge for the Motorcycle's depreciation in the amount of $5,870.25 and a "rent charge" of $8,323.11, for total base payments of $14,193.36. *Id.* It indicated the lease term was for 36 months and that Plaintiff would be required to make 35 additional monthly payments of $394.26. *Id.* Plaintiff agreed to maintain insurance throughout the lease term at his own expense. *Id.* at 4. The Lease Agreement provided that CCC "may sell, assign or in any other way transfer our rights and responsibilities in the Vehicle and this Lease." [ECF No. 21-2 at 5]. On the last page of the Lease Agreement, CCC assigned the "Lease and all right and title to the Vehicle" to Defendant. *Id.* at 7.

Plaintiff also completed a form labeled "Lease Application–Customer Statement." [ECF No. 21-2 at 10–11]. The form indicated "[t]his Lease Application–Customer Statement will be submitted to Chrome Capital, and its successors and assigns at 3073 S. Horseshoe Dr, Naples, FL 34104, for consideration of whether it meets the credit

_____

Motorcycle, on October 6, 2014. [ECF No. 35 at 35].

[4] The charge of $2,515.00 is referred to elsewhere as a "Down Payment." [ECF No. 21-2

4

requirements of Chrome Capital and its successors and assigns." *Id.* at 11. It specified that Plaintiff, as "[a]pplicant" would be "required to obtain and pay for vehicle insurance covering the vehicle for the full term of the lease." *Id.*

Plaintiff signed a separate document titled "Acknowledgements." [ECF No. 21-2 at 8]. The document was provided "as a summary of certain key points involved" in his "motorcycle lease package." *Id.* It reiterated that Plaintiff had agreed to maintain insurance coverage during the term of the lease; may have to pay a substantial charge if he terminated the lease before the end of the term; consented to make payments pursuant to an ACH authorization; agreed to maintain the Motorcycle as recommended in the owner's manual; consented to allow ACH drafts from his bank account for payment of personal property taxes for the Motorcycle; and agreed to pay certain fees at the end of the lease term. *Id.* Plaintiff executed an ACH Debit Authorization Form that authorized Defendant to automatically debit his bank account in the amount of $394.26 once a month beginning on October 1, 2014, for a term of 35 months. [ECF No. 35 at 23].

Plaintiff made a monthly payment through ACH debit on October 1, 2014. Fleming Aff. ¶ 11[5]; [ECF No. 35 at 26]. On October 15, 2014, Sarah Skare ("Ms. Skare"), Defendant's Senior Compliance Officer, sent Plaintiff an email noting that his Progressive insurance coverage for the Motorcycle had lapsed on October 7, 2014. Fleming Aff. ¶ 14; [ECF No. 35 at 28]. Ms. Skare informed Plaintiff that he was required to maintain insurance under the terms of the Lease Agreement and that a failure to

_____

at 10].

[5] The Affidavit of Tiffany Fleming ("Ms. Fleming"), Defendant's Chief Compliance

5

immediately reinstate insurance would constitute a default. [ECF No. 35 at 28–29]. Plaintiff made a monthly payment through ACH debit on November 1, 2014. Fleming Aff. ¶ 11; [ECF No. 35 at 26]. Defendant attempted to debit Plaintiff's ACH account for the monthly payment on December 1, 2014, but the charge was declined because Plaintiff stopped payment on the transaction. *Id.* at ¶ 12; ECF No. 35 at 27.

On December 4, 2014, Ms. Skare sent a letter informing Plaintiff that Defendant received notice that his Geico insurance policy[6] was cancelled on November 16, 2014, and that he had until December 11, 2014, to provide proof of insurance coverage for the Motorcycle. [ECF No. 25-2 at 1].

On or about December 4, 2014, Plaintiff sent a text message to Brandon Collins, assistant manager at CCC, that stated as follows: "Please be advised that you can come pick up the motorcycle as stated at 237 branchview dr, key is in the switch." Fleming Aff. ¶ 16; [ECF No. 35 at 31]; *see also* ECF No. 12 at 3. CCC notified Defendant of the text message from Plaintiff and Defendant authorized CCC to act as its agent to repossess the Motorcycle. [ECF No. 24-2 at 8]. CCC took possession of the Motorcycle on December 4, 2014. [ECF No. 12 at 3]; *see also* ECF No. 25-2 at 2.

On December 8, 2014, Ms. Fleming[7] sent a letter to Plaintiff that indicated Defendant had repossessed the Motorcycle and executed an affidavit of repossession. [ECF Nos. 25-2 at 2 and 35 at 32]. Ms. Fleming informed Plaintiff that the Motorcycle

---

Officer, may be found at ECF No. 35, 1–5.

[6] Although it is not entirely clear from the pleadings, it seems Plaintiff obtained insurance coverage through Geico after Progressive terminated his coverage.

[7] Ms. Fleming stated her former name was "Tiffany Davies." Fleming Aff. ¶ 19.

would be returned to him if he paid the full past due amount, including recovery expenses, within 10 days of the date of repossession. *Id.* Ms. Fleming indicated Plaintiff should contact Defendant by telephone to obtain the exact amount that must be paid for the Motorcycle to be returned and the Lease Agreement to be reinstated. *Id.* She stated the Motorcycle would be sold at private sale after December 14, 2014, if Plaintiff failed to take the steps necessary to reinstate the Lease Agreement. *Id.*

On December 11, 2014, Defendant's attorney, Brian C. Willis ("Mr. Willis"), wrote a letter to Plaintiff that stated Plaintiff had entered into a Lease Agreement with CCC and had agreed to make an initial payment of $3,309.26. [ECF No. 25-2 at 7]. Mr. Willis indicated that Plaintiff had authorized CCC to electronically debit his account for the initial payment, but that the transaction was rejected on 15 separate occasions because he had insufficient funds in his account. *Id.* He noted that Plaintiff had failed to make his most recent monthly payment to Defendant and had cancelled his insurance coverage for the Motorcycle. *Id.* He indicated Defendant had repossessed the Motorcycle on December 4, 2014, and that Plaintiff had until December 14, 2014, to pay the entire past due amount. *Id.*

On December 18, 2014, Mr. Willis sent a second letter to Plaintiff in response to his inquiry as to the amount required to reinstate the lease. [ECF No. 25-2 at 3]. Mr. Willis indicated Plaintiff would need to pay $2,953.97, which represented the $2,515.00 due at lease signing, the December 1 payment of $394.26, a five percent late fee of $19.71, and a stop payment fee of $25.00. *Id.* He indicated the $2,515.00 should be paid directly to CCC, as per the terms of the Lease Agreement. *Id.* He noted that CCC was

7

storing the Motorcycle and that Defendant would send a notification of release to CCC, once it received payment, notice that insurance was reinstated, and notice that payments would resume on the first day of each month from the ACH account on file. *Id.* Plaintiff failed to take the steps necessary to cure the default. Fleming Aff. ¶ 22.

On or about January 28, 2015, Defendant sold the Motorcycle to CCC for $10,650.00 and credited the sale price to Plaintiff's outstanding account balance. [ECF No. 35 at 36]; Fleming Aff. ¶ 24. Plaintiff failed to pay Defendant the additional amount outstanding on his account. Fleming Aff. ¶ 27.

## II.    Discussion

### A.    Standard on Summary Judgment

The court shall grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant bears the initial burden of demonstrating that summary judgment is appropriate; if the movant carries its burden, then the burden shifts to the non-movant to set forth specific facts shows that there is a genuine issue for trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). If a movant asserts that a fact cannot be disputed, it must support that assertion either by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials" or by "showing . . . that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1).

8

In considering a motion for summary judgment, the evidence of the non-moving party is to be believed and all justifiable inferences must be drawn in favor of the non-moving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). However, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* at 248. Further, while the federal court is charged with liberally construing a complaint filed by a pro se litigant to allow the development of a potentially meritorious case, *see, e.g., Cruz v. Beto*, 405 U.S. 319 (1972), the requirement of liberal construction does not mean that the court can ignore a clear failure in the pleadings to allege facts that set forth a federal claim, nor can the court assume the existence of a genuine issue of material fact when none exists. *Weller v. Dep't of Soc. Servs.*, 901 F.2d 387 (4th Cir. 1990).

B.      Analysis

Plaintiff alleges Defendant violated provisions of the FDCPA, breached its contractual obligations under 41 U.S.C. § 6503, breached the terms of the Lease Agreement, fraudulently misrepresented the terms of the Lease Agreement, and engaged in a civil conspiracy with CCC. [ECF Nos. 10, 12].

1.      The FDCPA

Plaintiff alleges Defendant violated 15 U.S.C. §§ 1692d, 1692e, 1692f, and 1692g of the FDCPA. [ECF Nos. 10 at 1, 12, and 25 at 1]. He maintains individuals employed by CCC repeatedly visited his home without invitation or authorization and threatened to repossess the Motorcycle. [ECF No. 12-2 at 3]. He contends Defendant failed to provide

him a notice of right to cure, notice of repossession, notice of sale, notice of proceeds for such sale of repossessed merchandise, and notice of actual date of sale, as required under the FDCPA. [ECF No. 25 at 1].

The FDCPA was enacted "to eliminate abusive debt collection practices by debt collectors, to insure that those debt collectors who refrain from using abusive debt collection practices are not completely disadvantaged, and to promote consistent State action to protect consumers against debt collection abuses." 15 U.S.C. § 1692(e). To establish a violation of the FDCPA, a plaintiff must prove (1) he has been the object of collection activity arising from consumer debt, (2) the defendant is a debt collector as defined by the FDCPA, and (3) the defendant has engaged in an act or omission prohibited by the FDCPA. *Chatman v. GC Services, LP*, No. 3:14-526-CMC, 57 F. Supp. 3d 560, 65 (D.S.C. 2014), citing *Webster v. ACB Receivables Mgmt., Inc.*, 15 F. Supp. 3d 619, 624–25 (D.Md. 2014).

The FDCPA defines a "debt collector" as "any person who uses any instrumentality of interstate commerce or the mails in any business the principal purpose of which is the collection of any debts, or who regularly collects or attempts to collect, directly or indirectly, debts owed or due or asserted to be owed or due another." 15 U.S.C. § 1692a(6). The following are not considered debt collectors under the FDCPA:

> (A) any officer or employee of a creditor, while in the name of the creditor, collecting debts for such creditor;
>
> (B) any person while acting as a debt collector for another person, both of whom are related by common ownership or affiliated by corporate control, if the person acting as a debt collector does so only for persons to whom it is so related or affiliated and if the principal business of such person is not the collection of debts;

(C) any officer or employee of the United States or any State to the extent that collecting or attempting to collect any debt is in the performance of official duties;

(D) any person while serving or attempting to serve legal process on any other person in connection with the judicial enforcement of any debt;

(E) any nonprofit organization which, at the request of consumers, performs bona fide consumer credit counseling and assists consumers in the liquidation of their debts by receiving payments from such consumers and distributing such amounts to creditors; and

(F) any person collecting or attempting to collect any debt owed or due or asserted to be owed or due another to the extent such activity is (i) incidental to a bona fide fiduciary obligation or a bona fide escrow arrangement; (ii) concerns a debt which was originated by such person; (iii) concerns a debt which was not in default at the time it was obtained by such person; or (iv) concerns a debt obtained by such person as a secured party in a commercial credit transaction involving the creditor.

*Id.*

The general distinction between debt collectors and non-debt collectors under the FDCPA is whether the individual or business is attempting to collect money owed to it or to another. *See* 15 U.S.C. § 1692a(6); *see also Brown v. Wachovia Bank*, C/A No. 8:10-1816-HMH-JDA, 2011 WL 5024297, at *3 (D.S.C. Sept. 30, 2011) ("[C]reditors collecting their own debts are not "debt collectors" for purposes of the FDCPA and are exempt from the FDCPA's provisions.") (citing *Glover v. Univ. Motor Co.*, C/A No. 3:08-2254, 2010 WL 234903, at *3 (D.S.C. Jan. 15, 2010); *Serfass v. CIT Group/Consumer Fin., Inc.*, C/A No. 8:07-90, 2008 WL 351116, at *3 (D.S.C. Feb. 7, 2008) (finding the defendant was not regulated by the FDCPA because the defendant was a creditor collecting its own debts); *Scott*, 326 F. Supp. 2d at 717 ("[C]reditors are not liable under the FDCPA." (citing *Perry v. Stewart Title Co.*, 756 F.2d 1197 (5th Cir.

1985))); *Davis v. Dillard Nat'l Bank*, C/A No. 1:02-546, 2003 WL 21297331, at *4 (M.D.N.C. June 4, 2003) ("Crediting institutions, such as banks, are not debt collectors under section 1692a(6)(A) because they collect their own debts and are in the business of lending money to consumers." (citing *Thomasson v. Bank One, La., N.A.*, 137 F. Supp. 2d 721, 724 (E.D. La. 2001); *Meads v. Citicorp Credit Servs., Inc.*, 686 F. Supp. 330, 333 (S.D. Ga. 1988))).

The facts establish that Defendant is a creditor, as opposed to a debt collector. Plaintiff entered into the Lease Agreement for the Motorcycle with CCC, which was immediately assigned to Defendant. [ECF No. 21-2 at 1–7]. Plaintiff does not dispute the assignment of the Lease Agreement to Defendant and recognizes that Defendant funded and financed the Lease Agreement, which was secured by the Motorcycle. [ECF No. 12 at 3]. Because Plaintiff fails to allege Defendant is a debt collector, his cause of action under the FDCPA must fail with regard to any efforts Defendant took to collect its own debt. *See Dempsey v. Greenville Heritage Federal Credit Union*, No. 6:15-664-TMC, 2015 WL 1564780, at *3 (D.S.C. Apr. 8, 2015) ("Plaintiff does not plausibly allege a violation of the FDCPA because the only reasonable inference from the Complaint is that Defendants were creditors because the Credit Union was the entity to whom the debt was owed and it was secured by Plaintiff's car . . . . The FDCPA does not create a right of action against a creditor for unfair practices . . . . ").

Plaintiff alleges Defendant violated the FDCPA by inducing CCC to violate the FDCPA to collect the debt. The undersigned's review of the facts reveals that Defendant did not induce CCC to violate the FDCPA. As an initial matter, liability under the

FDCPA is imposed only on debt collectors, and the undersigned's research has yielded no cases in which creditors have been held liable for the actions of debt collectors who attempted to collect the debt owed to the creditor. *See* 15 U.S.C. § 1692(e). Because the FDCPA does not create a cause of action for individuals to sue creditors for inducing debt collectors to perform actions in violation of the FDCPA, Defendant cannot be held liable for CCC's actions to collect the debt, even if Defendant had induced CCC to violate the FDCPA. In addition, Plaintiff has alleged no specific acts on the part of CCC to collect Defendant's debt that violate 15 U.S.C. § 1692d, 1692e, 1692f, or 1692g. While he alleges employees of CCC visited his home on multiple occasions to obtain payment of the debt, he does not allege they engaged in any of the prohibited behaviors under 15 U.S.C. § 1692d and does not allege CCC's actions were taken to obtain the funds owed to Defendant. He does not allege CCC used false, deceptive, or misleading representations or means to secure the debt owed to Defendant. *See* 15 U.S.C. § 1692e. He does not allege CCC engaged in any unfair or unconscionable means to collect or attempt to collect the debt owed to Defendant. *See* 15 U.S.C. § 1692f. The fact that Defendant authorized CCC to repossess the Motorcycle does not indicate a violation of the FDCPA because Defendant had a right to possession of the Motorcycle as collateral under the Lease Agreement. *See* 15 U.S.C. § 1692f(6). Finally, Plaintiff does not allege CCC failed to send the written notice required under 15 U.S.C. § 1692g with regard to any debt owed to Defendant.

Furthermore, the record suggests CCC's actions were taken for the purpose of collecting its own debt and were not induced by Defendant. Although Plaintiff argues to

the contrary, the record reflects that he entered into a contractual relationship with CCC. *See* ECF No. 21-2 at 1–7. As part of the Lease Agreement, Plaintiff agreed to pay CCC a down payment of $2,515.00. *Id.* at 2. The down payment was subtracted from the total gross capitalized cost[8] of the transaction to determine the total of base payments. *Id.* Therefore, Plaintiff received the benefit of the down payment because the cost of the Motorcycle was reduced over the lease period by $2,515.00. According to Ms. Fleming, Plaintiff verbally authorized CCC to debit the down payment from his MasterCard, but CCC never collected the down payment because the transaction was denied by MasterCard on 15 separate occasions.[9] Fleming Aff. ¶ 2, 8–10; *see also* ECF No. 35 at 24–25. Plaintiff alleges he was provided a receipt by CCC that showed he paid the down payment on August 27, 2014, but he declines to specify the total amount he paid or to attach proof of payment.[10] *Id.* at 1. He states in the complaint that "the lender stated first

---

[8] The agreed on value of the Motorcycle was $11,900.00, and CCC assessed charges for sales tax, an extended warranty and service contract, a documentation fee, and an acquisition fee for total gross capitalized costs of $14,120.00. [ECF No. 21-2 at 2].

[9] Ms. Fleming indicated Plaintiff paid a $400.00 security deposit and a first monthly payment of $394.26 on August 27, 2014. *Id.* at ¶ 11; [ECF No. 35 at 26]. Thus, the undersigned interprets Ms. Fleming's affidavit to indicate CCC attempted to charge the $2,515.00 down payment to Plaintiff's MasterCard on 15 separate occasions. Plaintiff disputes that he paid a $400.00 security deposit and maintains the trade-in-value of his used motorcycle was applied to the security deposit. [ECF No. 37 at 2].

[10] To the extent that Plaintiff references "[a]mount to be paid in cash" on the Lease Agreement and the check marks beside "Proof of Amounts Due at Lease Signing (copy of check, credit card/debit slip or receipt for cash)" on the funding checklist and "Enter Billing Master/Lease Sign Payment" on the Lease/Asset-Routing/Checklist to represent a receipt of payment, the undersigned rejects this argument. *See* ECF No. 21-2 at 2, 16. "Amount to be paid in cash" implies a future action and does not show that the amount has already been paid. The check mark beside "Proof of Amounts Due at Lease Signing," refers to "Amounts Due" as opposed to amount collected or paid, and because proof may be in the form of a credit card slip, it does not refute that CCC attempted to collect this

14

that the plaintiff failed to process the down payment to the dealer, a fact that wasn't known to the lender." [ECF No. 12 at 4]. He further states in his response that "Capital City Cycle, having provided a cash receipt to the lender, as stated in the contract, amount of cash provided, and if such collection wasn't accomplished, then that's an issue for the dealer but bears no bearing upon the contract." [ECF No. 25 at 4]. Although Plaintiff disputes the validity of it, the record reveals that CCC claimed a $2,515.00 lien on the Motorcycle based on Plaintiff's alleged failure to pay the down payment. *See* Fleming Aff. ¶¶ 8–10. Plaintiff has alleged no violation of the FDCPA on the part of CCC that can be attributed to CCC's attempt to collect Defendant's debt, as opposed to its own debt.

The facts also fail to corroborate Plaintiff's claim that Defendant acted as a debt collector for CCC. Defendant had a contractual relationship with CCC that pertained to the Motorcycle under the Assignment Agreement.[11] *See* ECF No. 21-2 at 7. Defendant received the benefit of the down payment because it acquired title to the Motorcycle for a lesser amount than if Plaintiff had not agreed to provide the $2,515.00 down payment. Although Defendant held the title to the Motorcycle, CCC communicated to Defendant that it was unable to collect the down payment, which meant that CCC had a lien on the Motorcycle for the $2,515.00 it was promised under the Lease Agreement. Fleming Aff. ¶¶ 8–10. The only evidence that suggests Defendant attempted to collect a debt for CCC is the December 18, 2014 letter from Mr. Willis that states "[p]ursuant to the terms of

---

amount from Plaintiff's MasterCard. While the Lease/Asset-Routing/Checklist contains a check mark beside "Enter Billing Master/Lease Sign Payment," the document indicates beside Lease Approval Status: FUNDING DELAY 8/29/2014. *See* ECF No. 25-2 at 10.

[11] The Assignment Agreement is referenced in the Lease Agreement, but is not attached

your Lease, the amount due at signing should be paid directly to Capital City Cycles ('CCC')." [ECF No. 25-2 at 3]. To the extent Plaintiff suggests this letter represents "false, deceptive, or misleading representation or means in connection with the collection of a debt" under 15 U.S.C. § 1692e, the undersigned rejects this argument. Mr. Willis's assertion that Plaintiff would have to pay the $2,515.00 down payment to CCC to reinstate the lease was "[p]ursuant to the terms" of the Lease Agreement, and shows that Defendant did not believe Plaintiff had provided the agreed-upon down payment.[12] *See* ECF No. 35 at 34. Defendant did not attempt to collect the debt for CCC, but rather informed Plaintiff of his obligation to satisfy the debt under the terms of the Lease Agreement. Therefore, Defendant did not assume the role of a debt collector by informing Plaintiff of his obligations under the Lease Agreement.

As discussed above, Plaintiff has failed to affirmatively state that he paid the down payment to CCC and has instead suggested that whether he paid the down payment to CCC was irrelevant to his contract with Defendant. *See* ECF No. 25 at 4. If Plaintiff did not pay the down payment to CCC, CCC had a lien on the Motorcycle, and Defendant correctly asserted that Plaintiff would have to satisfy that lien as part of the terms to reinstate the Lease Agreement. Defendant's communication to Plaintiff regarding the debt owed to CCC was based on CCC's representations to Defendant and their relationship under the Assignment Agreement and does not demonstrate any "unfair or

_____

to the pleadings.

[12] Although 15 U.S.C. § 1692e requires that a debt collector communicate that a debt is disputed, the record does not indicate Defendant was aware of any dispute regarding payment of the down payment. *See* Fleming Aff. ¶ 8–10.

16

unconscionable means to collect or attempt to collect any debt." *See* 15 U.S.C. § 1692f.

For the foregoing reasons, the undersigned recommends the court grant Defendant summary judgment on Plaintiff's causes of action under the FDCPA.

### 2.     Breach of Contract Under 41 U.S.C. § 6503

Plaintiff argues Defendant breached the contract in violation of 41 U.S.C. § 6503. [ECF No. 10 at 1]. Pursuant to 41 U.S.C. § 6503(a), the section applies only to contracts made by an agency of the United States for manufacture or furnishing of materials, supplies, articles, or equipment in an amount exceeding $10,000. *See* 41 U.S.C. § 6502. Because Plaintiff alleges a violation of a consumer contract that does not pertain to the manufacture or furnishing of materials, supplies, articles, or equipment, 41 U.S.C. § 6503 is inapplicable. Therefore, Plaintiff has failed to state a cause of action under 41 U.S.C. § 6503.

### 3.     Breach of Contract Generally

Plaintiff alleges Defendant breached its contractual obligations by repossessing the Motorcycle, providing no effective right to cure, failing to provide a notification of sale, selling the Motorcycle prior to the designated period, and failing to provide debt reconciliation after sale. [ECF No. 12 at 4]. Plaintiff alleges he cancelled the extended warranty agreement on September 1, 2014, within the 30-day period allowed for cancellation, but was not refunded the amount paid for the extended warranty. [ECF No. 12-2 at 5]. He argues Defendant violated his right to privacy under the contract by communicating with CCC regarding his debt. *Id.* at 4.

To recover for a breach of contract, South Carolina law requires a plaintiff prove the following: (1) the existence of a binding contract entered into by the parties; (2) a breach or unjustifiable failure to perform the contract; and (3) damage suffered by the plaintiff as a direct and proximate result of the breach. *Bank v. How Mad, Inc.*, No. 4:12-3159, 2013 WL 5566038, at *3 (D.S.C. Oct. 18, 2013), *citing Fuller v. E. Fire & Cas. Ins. Co.*, 240 S.C. 75, 124 S.E.2d 602 (S.C. 1962). The primary purpose of all rules of contract construction is to determine the intent of the parties. *Goldston v. State Farm Mut. Auto. Ins. Co.*, 594 S.E.2d 511, 518 (S.C. Ct. App. 2004). "If the contract's language is clear and unambiguous, the language alone determines the contract's force and effect." *Schulmeyer v. State Farm Fire & Cas. Co.,* 579 S.E.2d 132, 134 (S.C. 2003).

Plaintiff has demonstrated the existence of a binding contract between the parties in the form of the Lease Agreement. *See* ECF No. 21-2 at 1–7. The Lease Agreement provided that Plaintiff would be in default if he failed to make a payment as required by the lease or if "the prospect of payment, performance, or realization of collateral [was] significantly impaired." [ECF No. 21-2 at 4]. It also allowed Defendant to take any one or more of the following actions in the event of a default: (1) to terminate the Lease Agreement and Plaintiff's right to use the Motorcycle; (2) "to take any reasonable action" to correct Plaintiff's default or to prevent Defendant's loss, to include purchasing insurance that Plaintiff agreed to provide; (3) to require Plaintiff to return the Motorcycle and any related records or make them available to Defendant in a reasonable manner; (4) to take back the Motorcycle by legal process or "self help," but without breaching the peace or violating the law; or (5) to use any other remedy available to Defendant in the

18

Lease Agreement or by law. *Id.*

The undersigned's review of the Lease Agreement reveals that Plaintiff breached its terms in several ways. Under the terms of the Lease Agreement, Plaintiff was required to maintain insurance on the Motorcycle. [ECF No. 21-2 at 4]. Plaintiff first breached the terms of the contract on October 7, 2014, when he allowed his insurance to lapse. *See* ECF No. 35 at 28. He next breached the terms of the Lease Agreement on November 16, 2014, when he again allowed his insurance to lapse. [ECF No. 25-2 at 1]. He breached the terms of the Lease Agreement for a third time on December 1, 2014, when he directed his bank to stop payment. [ECF No. 35 at 27]. Because Plaintiff breached the contract by failing to make a payment and by failing to maintain insurance, which impaired Defendant's ability to realize its collateral, Defendant was entitled to take one or more of the actions specified under the contract. *See* ECF No. 21-2 at 4.

The evidence fails to support Plaintiff's allegation that Defendant breached his privacy rights under the contract by communicating with CCC. The contract does not preclude Defendant from communicating with CCC regarding Plaintiff's debt. *See* ECF No. 21-2 at 1–7. Defendant and CCC were both parties to the Lease Agreement in that Plaintiff originally contracted with CCC and CCC assigned its rights to Defendant. *See id.* Furthermore, Defendant's communication with CCC was necessitated by CCC's alleged lien on the Motorcycle and the fact that Defendant held the title to the Motorcycle. Thus, the facts do not support Plaintiff's allegation that Defendant breached his right to privacy under the Lease Agreement.

The evidence also fails to corroborate Plaintiff's allegation that Defendant breached the terms of the contract by directing CCC to repossess the Motorcycle. Plaintiff alleges Defendant was not allowed to repossess the Motorcycle without first giving him an opportunity to cure the default. A review of the Lease Agreement provides no provisions for cure of default.[13] Furthermore, Plaintiff's voluntary relinquishment of the Motorcycle negated any obligation Defendant had to provide a right to cure prior to repossessing the Motorcycle.[14] *See* Fleming Aff. ¶ 16; ECF No. 35 at 31; *see also* ECF No. 12 at 3. Defendant provided Plaintiff with notice of his right to cure after the repossession, but Plaintiff failed to exercise his option to cure. [ECF No. 35 at 34]; Fleming Aff. ¶ 22. The evidence disproves Plaintiff's assertion that Defendant sold the Motorcycle prior to the expiration of the period he was allowed to cure the default and shows Defendant did not sell the Motorcycle until January 28, 2015. [ECF No. 35 at 36]. Plaintiff has cited no provisions of the Lease Agreement that required Defendant to provide debt reconciliation after sale. To the extent Plaintiff argues Defendant erred in failing to cancel or to return the payment for the extended warranty, the undersigned notes Plaintiff paid no upfront cost for the extended warranty and that the $1,190.00 for the extended warranty and service contract was included in the gross capitalized costs to be paid over the 36 month payment term. *See* ECF No. 21-2 at 2. Because Plaintiff made

---

[13] Although there are some requirements for notice of a consumer's right to cure under state and federal law, Plaintiff does not cite any particular law that Defendant allegedly violated.

[14] Although Plaintiff argues his communication to Brandon Collins at CCC authorizing him to come pick up the Motorcycle was not an authorization for Defendant to repossess the Motorcycle [ECF No. 12 at 3], the undersigned rejects this argument for the reasons

only three payments under the Lease Agreement and provided no proof that he cancelled the extended warranty agreement, the undersigned finds he has failed to show that he is entitled to compensation for Defendant's alleged failure to cancel the extended warranty.

### 4.      Fraudulent Misrepresentation

Plaintiff has generally alleged that Defendant "made assertions that the contract wasn't complete due to a failed payment to Capital City Cycle, which wasn't subjective to the contract." [ECF No. 12 at 3]. He also alleges Defendant indicated in its December 4, 2014 letter that he would have until December 11, 2014, to provide proof of insurance coverage, but had already repossessed the Motorcycle on December 3, 2014. *Id.* Plaintiff contends Defendant initially stated the Motorcycle was repossessed because of a failed payment to the dealer, but stated in the alternative that the Motorcycle was repossessed through his voluntary act. *Id.* at 4. He maintains Defendant ultimately stated it had nothing to do with the down payment and that the down payment was a matter between Plaintiff and the dealer. *Id.*

To state a claim for fraudulent misrepresentation, a plaintiff must allege (1) a representation; (2) its falsity; (3) its materiality; (4) either knowledge of its falsity or a reckless disregard of its truth or falsity; (5) intent that the representation be acted upon; (6) the hearer's ignorance of the falsity; (7) the hearer's reliance on its truth; (8) the hearer's right to rely thereon; and (9) the hearer's consequent and proximate injury. *M.B. Kahn Constr. Co. v. S.C. Nat'l Bank of Charleston*, 271 S.E.2d 414, 415 (S.C. 1980). "Failure to prove any one of the foregoing elements is fatal to recovery." *Id.*, citing

---

discussed above.

*O'Shields v. South Fountain Mobile Homes, Inc.*, 204 S.E.2d 50 (S.C. 1974).

Although Plaintiff points specifically to the December 4, 2014 letter and generally to Defendant's statements that he considers to be contradictory, he has not alleged facts that support a claim for fraudulent misrepresentation against Defendant. Plaintiff essentially argues that Defendant should not have received information from CCC or should not have relied on information about the alleged failed payment to CCC because they were outside the terms of the Lease Agreement. *See* ECF Nos. 12 at 4; *see M.B. Kahn Constr. Co.*, 271 S.E.2d at 415. He does not allege the statements regarding the down payment owed to CCC were false. *See M.B. Kahn Constr. Co.*, 271 S.E.2d at 415. He fails to allege Defendant knew the statements regarding the down payment to CCC were false or recklessly disregarded their truth or falsity. *See id.* He does not allege he was unaware of the falsity of Defendant's statements, relied on the truth of Defendant's statements, or was injured based on his reliance on Defendant's statements. *See id.*

Plaintiff incorrectly asserts the Motorcycle was repossessed the day before Ms. Skare wrote the December 4, 2014 letter that purported to give him until December 11, 2014, to provide proof of insurance. The record shows the Motorcycle was repossessed on December 4, 2014. *See* Fleming Aff. ¶ 16; [ECF No. 35 at 31]. It is possible the letter was drafted before the Motorcycle was repossessed. However, even if the letter were drafted after the Motorcycle was repossessed, Plaintiff has not alleged an injury based on his reliance on the December 4, 2014 letter. Therefore, he has a failed to allege facts sufficient to support a cause of action for fraudulent misrepresentation.

5.     Civil Conspiracy

Plaintiff alleges Defendant conspired with CCC to breach the Lease Agreement, to violate the terms of the FDCPA, and to obtain funds that were not included in the terms of the contract through fraudulent misrepresentation. [ECF No. 12 at 4].

"The elements of civil conspiracy in South Carolina are (1) the combination of two or more people; (2) for the purpose of injuring the plaintiff; (3) which causes special damages." *Workman v. Nationwide Mut. Ins. Co.*, No. 4:12-2567-JMC, 2013 WL 3353910, at *3 (D.S.C. July 3, 2013), citing *Pye v. Estate of Fox*, 369 S.C. 555, 556–57, 633 S.E.2d 505, 511 (S.C. 2006). A cause of action for civil conspiracy must show that the parties to the conspiracy agreed to do an unlawful act or to do a lawful act in an unlawful way. *Ryan v. Eli Lilly & Co.*, 514 F. Supp. 1004, 1012 (D.S.C. 1981). "Importantly, 'where the particular acts charged as a conspiracy are the same as those relied on as the tortious act or actionable wrong, plaintiff cannot recover damages for such act or wrong, and recover likewise on the conspiracy to do the act or wrong.'" *Turnage v. JP Morgan Chase Bank*, No. 2:11-2916-RMG, 2012 WL 12354226 (D.S.C. Apr. 13, 2012), citing *Todd v. South Carolina Farm Bureau Mut. Ins. Co.*, 276 S.C. 284, 293 (S.C. 1981). "A claim for civil conspiracy must allege additional acts in furtherance of a conspiracy rather than reallege other claims within the complaint." *Id.*, citing *Hackworth v. Greywood at Hammett, LLC*, 385 (S.C. Ct. App. 2009). In addition, to adequately plead special damages, the plaintiff must cite damages that "go beyond the damages alleged in other causes of action." *Id.*

23

Plaintiff has failed to cite any evidence that Defendant and CCC conspired to perform an unlawful act or to perform a lawful act in an unlawful way. *See Ryan*, 514 F. Supp. at 1012. He has not asserted any acts as part of a conspiracy or resulting damages that are separate from his allegations that Defendant conspired with CCC to violate the FDCPA, breach the contract, or engage in fraudulent misrepresentation of the terms of the contract. Viewing Plaintiff's allegations in light of the relevant case law, the undersigned recommends the court find he has failed to adequately plead a claim for civil conspiracy.

III.    Conclusion and Recommendation

For the foregoing reasons, the undersigned recommends the court grant Defendant's motion for summary judgment.

IT IS SO RECOMMENDED.

July 25, 2016                                     Shiva V. Hodges
Columbia, South Carolina                         United States Magistrate Judge

**The parties are directed to note the important information in the attached "Notice of Right to File Objections to Report and Recommendation."**

**Notice of Right to File Objections to Report and Recommendation**

The parties are advised that they may file specific written objections to this Report and Recommendation with the District Judge. Objections must specifically identify the portions of the Report and Recommendation to which objections are made and the basis for such objections. "[I]n the absence of a timely filed objection, a district court need not conduct a de novo review, but instead must 'only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation.'" *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310 (4th Cir. 2005) (quoting Fed. R. Civ. P. 72 advisory committee's note).

Specific written objections must be filed within fourteen (14) days of the date of service of this Report and Recommendation. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *see* Fed. R. Civ. P. 6(a), (d). Filing by mail pursuant to Federal Rule of Civil Procedure 5 may be accomplished by mailing objections to:

Robin L. Blume, Clerk
United States District Court
901 Richland Street
Columbia, South Carolina 29201

**Failure to timely file specific written objections to this Report and Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon such Recommendation.** 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).